[Cite as *State v. Hussing*, 2012-Ohio-4938.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97972**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MONICA HUSSING

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-521825

**BEFORE:** Blackmon, A.J., Celebrezze, J., and Sweeney, J.

**RELEASED AND JOURNALIZED:** October 25, 2012

**ATTORNEY FOR APPELLANT**

Edward M. Heindel
450 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Mary H. McGrath
Anna M. Faraglia
Assistant County Prosecutors
8th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, A.J.:

{¶1}   Appellant Monica Hussing appeals her guilty plea to attempted involuntary manslaughter and assigns the following four errors for our review:

**I.   The trial court did not comply with Criminal Rule 11 before accepting Hussing's guilty plea, and the plea of guilty was not knowingly, intelligently, and voluntarily made.**

**II.   The trial court erred when it sentenced Hussing to the maximum possible prison sentence.**

**III.   The trial court erred during the sentencing hearing when it considered a victim impact statement from the Cuyahoga County Department of Children and Family Services in violation of R.C. 2930.13.**

**IV.   The trial court erred when it relied upon the statements of an expert witness at sentencing, which statements contained new material facts, in violation of R.C. 2930.14(B).**

{¶2}   Having reviewed the record and pertinent law, we affirm Hussing's conviction.   The apposite facts follow.

### Facts

{¶3}   In April 2009, the Cuyahoga County Grand Jury indicted Hussing on one count of involuntary manslaughter, three counts of child endangerment, and one count of felonious assault.[1]   The charges arose from the 2008 death of her eight-year-old son, Willy, who died of bronchopneumonia due to Stage IV Hodgkin's Lymphoma.   The child's death was ruled a homicide due to Hussing's failure to seek medical attention for

---

[1]Hussing's husband, William Robinson, Sr., was indicted on identical charges and has filed a separate appeal.

her dying child. In January 2012, Hussing pled guilty to one count of attempted involuntary manslaughter. Sentence was continued for the court to obtain a presentence investigation report and psychiatric report. The state and Hussing also submitted sentencing memoranda.

{¶4} According to the statements made at the sentencing hearing and the information contained in the sentencing memorandum, Willy suffered a needlessly painful death. Willy originally lived with his parents and his five siblings in Warren, Ohio. In October 2006, Hussing's sister, Sheila Slawinski, stayed with the family for two weeks after a death in the family. At that time, Slawinski noticed swelling in Willy's neck and that it was painful for Willy to walk. The only bathroom in the home was on the second floor; Willy would cry at the bottom of the steps because it would hurt to the climb the stairs. Slawinski and Hussing argued regarding Willy's condition, with Slawinski pleading with her to take him to a doctor. Hussing refused to take him for medical care, and the sisters ceased communicating with each other.

{¶5} Shortly thereafter, an anonymous call was made to Trumbull County Children and Family Services, which Hussing contends was made by Slawinski. The caller contacted the agency because the children were not in school and because of the lump observed on Willy's neck. A social worker was assigned to the case; their case plan required the parents to enroll the children in school and to take Willy to the doctor. For six months, Hussing would repeatedly lie to her social worker and tell him that she had applied for home schooling and medical coverage. In fact, she had not applied for either. The parents eventually moved to Cuyahoga County to escape the agency's

supervision. The Cuyahoga County Department of Children and Family Services ("CCDCFS") were not aware of the family until the hospital called to report the death of Willy.

{¶6} In the spring of 2007, Slawinski saw photos of Willy on line and observed he looked sick. She called Hussing and told her that she would take Willy to the doctor and pay for his care. Hussing told her, "You need to mind your own f-----g business and stay the f--k out of mine." The last time that Slawinski saw Willy was at her daughter's graduation party in the summer of 2007. At that time, the aunt noticed that Willy sat by himself and did not play with the other children. He looked pale, had blue circles under his eyes, and complained that his legs and stomach hurt. The oldest child, who is 18, lived with Hussing at the time of the hearing.

{¶7} Grant Boone is Hussing's brother. He told the prosecutor that he saw a lump the size of a softball on Willy's neck in May of 2007. When he told his sister to take Willy to the doctor she told him to "Mind your own f-----g business. They're my kids and I'm raising them." He last saw Willy three weeks prior to his death. His face and head were swollen, and he was very pale.

{¶8} Timothy Boone was Willy's cousin. He told the prosecutor that he saw Willy crying at the bottom of the stairs because his legs hurt so bad he could not climb the stairs to use the bathroom. He said Willy would urinate in a milk jug because he could not climb the stairs and spent a lot of time sleeping. He heard Willy ask his mother several times to take him to the doctor, and she would tell him to wait for his father to come home.

**{¶9}**  Tina Milloy, Willy's aunt, told the prosecutor that she too saw Willy in so much pain he could not climb the stairs.  She asked Hussing several months before Willy's death why she did not take him to the doctor, and Hussing stated she did not have medical coverage.   Milloy informed her that the free clinic would treat her son.

**{¶10}**  Records from the Trumbull Memorial Hospital indicated that on December 18, 2007, the parents had obtained treatment for one of their daughter's who sustained a knee injury even though the family was not insured.  Willy was exhibiting signs of sickness during this time, yet received no treatment.  Dr. Lolita McDavid, Medical Director of Child Advocacy and Protection at Rainbow Babies & Children's Hospital, testified that the cost of the medical care did not excuse the parents' failure to seek care for the child because Medicaid would have covered the child's treatment.

**{¶11}**  Dr. John Letterio from Rainbow Babies & Children's Hospital, a specialist in pediatric hematology oncology, testified at the hearing.  He stated that he was certain that if Willy had received medical treatment, he would have survived because Hodgkins Lymphoma is a "highly curable cancer."   The doctor testified that it would have been impossible for the parents to have not realized that the child was sick and in pain. According to the doctor, aside from the loss of organ function, the pain from the growth of the cancer throughout Willy's body would have been "immeasurable."

**{¶12}**  Reviewing the autopsy photographs, the doctor testified that the child's limbs had atrophied and his abdomen protruded indicating that the child had become malnourished and was in a catabolic state prior to death.  It would have been strenuous for Willy to walk for the last few months of his life because of the congestion in his lungs

and the cancer invading his bone marrow. This would not have been a physical state that abruptly occurred during the last days of his life.

{¶13} CCDCFS, which is currently monitoring Willy's siblings, submitted a victim impact statement in which it stated that Willy's siblings have all been affected by their parents' failure to care for Willy and his eventual death. They suffer from feelings of confusion regarding the tragedy of their brother's death and love for their parents. The children recalled that a few days before his death, Willy called each one of them into his room to spend time with them and say goodbye because he knew he was going to die. According to the social worker, "they're going to have to go through a tremendous amount of pain and difficulty before they can begin to heal and become emotionally healthy adults." Slawinski and her husband now have custody of the four minor children.

{¶14} Willy's 18 year-old half-sister testified on her mother's behalf. At the time of sentencing she was living with her mother. She was 14 years old when her brother died. She claimed that her parents tried to get medical help for her brother, but were denied assistance. She stated that her brother was able to do things like a normal eight year old and was not in pain and did not appear sick. She claimed he did not become sick until several days prior to his death.

{¶15} Hussing addressed the court and stated that her sister who spoke of her son might have seen him about four times in his life, and, therefore, did not know her son well. She also stated that she missed and loved her son. In her sentencing memorandum, Hussing argued she did not know her son was seriously ill and thought he

suffered from swollen glands. She also contended she could not afford to pay for medical care for Willy.

{¶16} After setting forth its findings, the trial court sentenced Hussing to the maximum sentence of eight years in prison.

## Guilty Plea

{¶17} In her first assigned error, Hussing argues that her guilty plea was not knowingly, intelligently, and voluntarily made because the trial court failed to adequately explain her right against self-incrimination and failed to adequately explain the possible sentence she was facing.

{¶18} Under Crim.R. 11(C), prior to accepting a guilty plea in a felony case, a court must conduct an oral dialogue with the defendant to determine that the plea is voluntary, that the defendant understands the nature of the charges and the maximum penalty involved, and to personally inform the defendant of the constitutional guarantees he is waiving by pleading guilty.

{¶19} In determining whether the trial court has satisfied its duties under Crim.R. 11 in taking a plea, reviewing courts have distinguished constitutional and non-constitutional rights. *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, 897 N.E.2d 621, ¶18 and 27; *State v. Gibson*, 34 Ohio App.3d 146, 147, 517 N.E.2d 990 (8th Dist.1986). The trial court must strictly comply with those provisions of Crim.R. 11(C) that relate to the waiver of constitutional rights. *State v. Stewart*, 51 Ohio St.2d 86, 88-89, 364 N.E.2d 1163 (1977); *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph one of the syllabus.

**{¶20}** For nonconstitutional rights, scrupulous adherence to Crim.R. 11(C) is not required and "substantial compliance" is sufficient. *State v. Stewart*, 51 Ohio St.2d 86, 364 N.E.2d 1163 (1977); *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 31. "Substantial compliance means that under the totality of the circumstances the defendant subjectively understands the implications of his plea and the rights he is waiving." *State v. Nero*, 56 Ohio St.3d 106, 108, 564 N.E.2d 474 (1990).

**{¶21}** Hussing contends her plea was invalid because the trial court did not adequately explain her right against self-incrimination. This is a constitutional right and, therefore, requires strict compliance. The trial court advised Hussing and her husband as follows:

> **At all times during these proceedings each of you have the absolute right to remain silent. If you were to proceed to trial and not testify, the State of Ohio could not use your silence against you in an effort to prove you guilty; do you understand that?** Tr. 20.

To which Hussing responded, "Yes, your honor."

**{¶22}** Strict compliance "does not require a rote recitation of the exact language of the rule; rather, the focus on review is whether the record shows that the judge explained these rights in a manner reasonably intelligible to the defendant." *Ballard*, 66 Ohio St.2d 480, 423 N.E.2d 115. The trial court's advisement adequately explained the right against self-incrimination. We held in *State v. Burston*, 8th Dist. No. 93645, 2010-Ohio-5120, that the advisement, "Do you understand that you are giving up your right in each case to remain silent and not testify?" complied with Crim.R. 11(C) because it was reasonably intelligible to the defendant. Here, the trial court went even further and

explained that her silence could not be used against her. Moreover, when the trial court asked if she understood its explanation of the right, she stated that she did.

{¶23} Hussing also contends the trial court failed to adequately advise her of the possible sentence. The trial court informed Hussing that "felonies of the second degree are punishable by between two and eight years in state prison." Hussing contends the trial court should have told her that the possible sentence was 2, 3, 4, 5, 6, 7, or 8 years, which would have notified her that she could not receive a sentence such as two and one-half years. Crim.R. 11(C)(2)(a) only requires that the defendant be advised of the maximum penalty involved. The trial court advised that the maximum sentence was eight years; therefore, it complied with its duty in advising Hussing pursuant to Crim.R.11(C)(2)(a). The court has no duty to advise the defendant that nothing less than whole years can be imposed. Accordingly, Hussing's first assigned error is overruled.

## Maximum Sentence

{¶24} In her second assigned error, Hussing argues that the trial court erred by sentencing her to the maximum sentence.

{¶25} We review Hussing's sentence under the two-prong test set forth in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. Under the first prong, we review whether the trial court complied with all applicable rules and statutes to determine if the sentence was clearly and convincingly contrary to law. After finding the first prong satisfied, we review the trial court's decision under an abuse of discretion standard. *Id*. at ¶ 4.

**{¶26}** The record reflects that Hussing was sentenced to a prison term of eight years for the charge of attempted involuntary manslaughter, a felony of the second degree, which is within the statutory parameters for such an offense. The record also indicates that the trial court considered the appropriate statutory guidelines in determining the sentence.

**{¶27}** H.B. 86 took effect on September 30, 2011. Hussing was sentenced on February 16, 2012, therefore, the amendments to the sentencing statutes apply to Hussing's sentence. One of the changes H.B. 86 imposed as to the felony sentencing laws concerns the purposes of felony sentencing, as stated in R.C. 2929.11(A). The two primary purposes of felony sentencing remain "to protect the public from future crime by the offender and others and to punish the offender * * *." *Id*. These goals, however, are to be realized "using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." *Id.*

**{¶28}** In complying with the objectives set forth in R.C. 2929.11, the court must consider the seriousness and recidivism factors under R.C. 2929.12. *State v. Stone*, 3d Dist. No. 9-11-39, 2012-Ohio-1895, ¶ 10. However, R.C. 2929.11 and 2929.12 do not mandate judicial fact-finding, but direct the court to "consider" the factors. *State v. Sutton*, 8th Dist. No. 97132, 2012-Ohio-1054. "Thus, 'in exercising its discretion, a court is merely required to "consider" the purposes of sentencing in R.C. 2929.11 and the statutory * * * factors set forth in R.C. 2929.12.'" *Sutton*, citing *State v. Lloyd,* 11th Dist. No. 2006-Ohio-L-185, 2007-Ohio-3013, ¶ 44.

**{¶29}** Here, prior to sentencing Hussing, the trial court acknowledged the purposes and principles of sentencing as set forth in R.C. 2929.11 and after discussing the facts of the case proceeded to detail the seriousness and recidivism factors set forth in R.C. 2929.12 in determining the sentence. The court found that 1) the offender's relationship with the child facilitated the offense because the child was at his parents' mercy to receive medical care; 2) the mental and physical injury suffered by the child due to the parents' conduct "was exacerbated because of the physical and mental condition or age of the victim"; and, 3) the victim suffered serious physical, psychological harm as a result of the offense.

**{¶30}** As to the likelihood of recidivism, the court found that based on the presentence investigation report and the psychological report, the mother had a demonstrated pattern of drug or alcohol abuse and refused treatment for the abuse. The psychiatric report indicated that Hussing was addicted to marijuana. The court also found that Hussing showed no remorse regarding the death of the child. Finally, the court acknowledged that the parents did not have prior criminal histories, but concluded that the criminal conduct was so egregious that prison was necessary.

**{¶31}** Based on the record, the first prong of the *Kalish* test was satisfied because the court complied with the sentencing statutes in imposing the sentence. Regarding the second prong of the test, we conclude the trial court did not abuse its discretion by imposing the maximum sentence. Hussing's conduct was more serious than conduct that normally constitutes the offense according to the factors listed in R.C. 2929.12(B). The record demonstrates that Hussing was the victim's mother and that he was at her mercy to

obtain medical care. In fact he pleaded with her to take him to the doctor, yet she refused and allowed the child to suffer a slow and painful death that could have been prevented with medical care. Accordingly, Hussing's second assigned error is overruled.

## Victim Impact Statement

{¶32} In her third assigned error, Hussing argues the trial court erred by considering the victim impact statement from the CCDCFS because the CCDCFS was not a victim.

{¶33} At trial, Hussing's counsel objected to the victim impact statement. In response, the state explained that CCDCFS became involved with the family after Willy died and has since been involved with the remaining children. The purpose of the impact statement was to present the effect that Willy's death had on his siblings, rather than bring the traumatized children to court to face their parents. Thus, CCDCFS was acting as the children's representative. Moreover, the victim was dead. R.C. 2930.01 defines "victim's representative" as "a member of the victim's family or another person who pursuant to the authority of section 2930.02 of the Revised Code exercises the rights of a victim under this chapter." R.C. 2930.02(A) allows a representative to speak on behalf of the victim if the victim is a minor or deceased. In the case, the siblings were minors and the victim was deceased. Therefore, the court did not err by allowing the statement of CCDCFS to be introduced. Accordingly, Hussing's third assigned error is overruled.

## Expert Witness

**{¶34}** In her fourth assigned error, Hussing argues the trial court erred by allowing the expert testimony of Dr. Letterio at the sentencing hearing. Hussing contends the doctor was allowed to testify without being sworn in or subject to cross-examination.

**{¶35}** Defense counsel objected to Dr. Letterio testifying at the sentencing hearing. The prosecutor responded that the doctor's testimony was necessary because defense counsel had appeared on national TV to state that medical care was not afforded to the family and that Willy never exhibited any characteristics that would have indicated that he was ill. These were the same arguments contained within Hussing's sentencing memorandum. Thus, the state was anticipating Hussing was going to deny the child exhibited any symptoms. Dr. Letterio testified that the autopsy indicated the child had tumors on every organ of his body, had a protruding stomach and joints, and would have been in excruciating pain; therefore, it would have been impossible for the parents to have not known the child was seriously ill. The doctor also testified that if the child had received medical care he would have survived the cancer.

**{¶36}** R.C. 2929.19(A) provides in part:

> **At the hearing, the offender, the prosecuting attorney, the victim or the victim's representative in accordance with section 2930.14 of the Revised Code, and,** *with the approval of the court, any other person may present information relevant to the imposition of sentence in the case*. (Emphasis added.)

**{¶37}** The doctor's testimony was relevant to the imposition of the sentence. The mother and her eldest daughter stated at the sentencing hearing that the child appeared healthy until a few days before his death. The state anticipated Hussing would maintain

that she was ignorant of his condition; therefore, the doctor's testimony was necessary to rebut this contention.

**{¶38}** We find no error in the trial court allowing the doctor to give unsworn testimony as the Rules of Evidence do not apply to sentencing hearings. Evid.R. 101(C)(1), (3). As to the court's failure to allow cross-examination, defense counsel never requested the opportunity to question the doctor. Moreover, the child's relatives all stated that it was obvious that Willy was sick and in pain. Therefore, the doctor's testimony was not new evidence. Accordingly, Hussing's fourth assigned error is overruled.

**{¶39}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., J., and
JAMES J. SWEENEY, J., CONCUR